UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| FLOYD L. HYATTE, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| v. | ) | No. 1:10-CV-127 |
| | ) | *Judge Curtis L. Collier* |
| JIM MORROW, Warden, | ) | |
| | ) | |
| *Respondent.* | ) | |

# **M E M O R A N D U M**

Floyd L. Hyatte ("Petitioner") has filed a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 (Court File No. 2). Following a jury trial, Petitioner was convicted of first degree

murder in the Valentine Day death of twenty-four year old Johnny Joe Dillard and sentenced to life

imprisonment in the Tennessee Department of Corrections. *See State v. Hyatte,* No. 03C01-9511-

CC-00343, 1997 WL 53454 (Tenn. Crim. App. Feb. 11, 1997), *app. denied,* (Tenn. Sept. 29, 1997).

Petitioner petitions this Court for review of that conviction, basing his effort for relief generally on

claims of denial of his constitutional right to effective assistance of counsel, right to testify, due

process, and a fair trial.

Jim Morrow, ("Respondent") Warden of the facility where Petitioner is housed, filed an

answer to the petition which he subsequently requested the Court to treat as a motion for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Court Mile No. 16). The

Court granted the request and directed Petitioner to file a response (Court File No. 17). Petitioner

filed a response requesting the Court to deny the motion for summary judgment and resting solely

on his averments in his habeas petition(Court File No. 18).

After considering the filings of Petitioner and Respondent, the record of the state proceedings, and the applicable law, the Court will **GRANT** Respondent's motion for summary judgment (Court File No. 9) and **DISMISS** Petitioner's § 2254 petition (Court File No. 2).

## I.    STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254.  Under Rule 8 of the Rules Governing Section 2254 Proceedings in the United States Districts Courts, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required.  If a hearing is not required, the district judge may dispose of the case as justice dictates.  After carefully reviewing the required materials, the Court finds it unnecessary to hold an evidentiary hearing

Federal courts, pursuant to 28 U.S.C. § 2254(d), which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review decisions of the state courts.  This statute limits a federal district court's jurisdiction to review habeas claims on the merits.  In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1) and (2).

2

Ordinarily when state courts issue orders denying relief without discussing the applicable law, this Court must "'conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Brown v. Pitcher*, 19 Fed.Appx. 154 (6th Cir.2001) (unpublished table decision), *available in* 2001 WL 700858, at *2, *cert. denied,* 534 U.S. 1057 (2001) (*quoting Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001)). "'That independent review, however, is not a full, *de novo*, review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.'" *Palazzolo v. Gorcyca*, 244 F.3d 512, 516 (6th Cir. 2001), *cert. denied,* 534 U.S. 828 (2001)(*quoting Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001)). *De novo* review is required, however, when a state court incorrectly frames its legal analysis of a claim in light of clearly established Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 396-98 (2000) (analyzing *de novo* the prejudice prong of the *Strickland* test in relating to counsel's errors at sentencing); *Magana v. Hofbauer,* 263 F.3d 542, 551 (6th Cir. 2001)(engaged in *de novo* review of ineffective assistance of counsel claim because court concluded state court's legal formulation of defendant's burden of proof to prove prejudice was not just a reasonable probability but an absolute certain the outcome of the proceedings would have been different).

Credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990). A habeas petitioner may rebut

3

the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

## II.    <u>PROCEDURAL HISTORY</u>

Petitioner and co-defendant Gregory Scott Garmany ("Garmany") were indicted on a first-degree murder charge for the Valentine's Day murder (February 14, 1993) of Johnny Joe Dillard. Garmany's initial statement exculpated Petitioner, but Garmany gave a subsequent statement inculpating Petitioner. Petitioner's case was severed from Garmany's, and his first trial resulted in a mistrial at the conclusion of the State's proof, due to improper jury separation [Addendum No. 1, Vol. 1, at 8-9, Addendum No. 3, Volume 1, at 96 ]. Thereafter, Petitioner was convicted of first degree murder by a jury on November 17, 1994, and sentenced to life [Addendum No. 1, Vol. 1, at 11-12].

Petitioner's timely motion for new trial was denied on July 17, 1995 [Addendum No. 1, Vol. 1, at 30]. Petitioner then filed a direct appeal to the Tennessee Court of Criminal Appeals. On February 11, 1997, the appellate court affirmed the murder conviction and sentence [Addendum No. 2, Document 3]. Permission to appeal to the Tennessee Supreme Court was denied on September 29, 1997 [Addendum No. 2, Document 6].

Petitioner filed a *pro se* petition for state post-conviction relief in Rhea County Circuit Court on December 30, 1997 [Addendum No. 3, Vol. 1, at 1-9]. Counsel was appointed on January 8, 1998 [Addendum No. 3, Vol. 1, at 10] and substitute counsel was appointed on September 29, 1999 [Addendum No. 3, Vol. 1, at 64]. Amendments to the state post-conviction petition were filed

[Addendum No. 3, Vol. 1, at 65-74, 82-83].  After a hearing on petitioner's state post-conviction petition, the state post-conviction court dismissed the petition on November 14, 2007 [Addendum No. 3, Vol. 1, at 95-100].  On January 9, 2009, the appellate court affirmed the state post-conviction court's denial of relief.  *Hyatte v. State,* E2007-02646-CCa-R3-PC, 2009 WL 55917 (Tenn. Crim. App. Jan. 9, 2009), *perm. app. denied* (Tenn. May 26, 2009).  Petitioner's application for permission to appeal was denied by the Tennessee Supreme Court on May 26, 2009.  Petitioner subsequently timely filed this federal § 2254 habeas petition.

## III.     FACTUAL BACKGROUND

The facts of the crime will be taken from the appellate court's opinion on direct review.  The facts presented in the state post conviction hearing will be taken from the appellate court's opinion affirming the denial of petitioner's state post-conviction petition.

### A.      Facts from Criminal Trial

The facts as to the conviction which is before this Court are taken from the appellate court's opinion affirming the murder conviction and sentence:

> On February 14, 1993, Valentine's Day, the Appellant shot and killed Johnny Joe Dillard. The following events led up to the murder. On that Sunday morning, Billy Coleman, Arlene "Sissy" Price, Larry Goss, Johnny Dillard, and James Nixon were "partying", i.e. drinking beer, in James Nixon's apartment in the Taylor Hills Housing Projects in Dayton, Tennessee. Over the course of the day, a few other individuals stopped by, drank beer, and then left.
>
> Later in the afternoon, probably between 4:00 and 5:30 p.m., Billy Coleman and Sissy Price were getting ready to leave the gathering. Suddenly, and for no apparent reason, Johnny Dillard stabbed Billy Coleman in the back with a kitchen knife and ran out the door.[1]  Outside the Nixon apartment, ten-year old Bobby Combs witnessed Johnny Dillard run to the top of the Taylor Hills Projects and into the

---

[1]      The knife wound in Billy Coleman's back, however serious, was not fatal and after being treated at the Rhea County Emergency Clinic and Erlanger Hospital, he recovered fully.

woods behind the residential area.

Combs then went up to the Appellant's residence, which was located near the top of the hill at the Taylor Hills Projects, and told the Appellant's wife that Billy Coleman had been stabbed. Hearing this the Appellant and Greg Garmany left the Appellant's house. On the street outside the house they encountered Bobby Combs and he showed them where Dillard ran into the woods. The Appellant and Garmany walked up to the edge of the woods and as they were coming back into the projects, Bobby Combs overheard one of them saying "let me get this gun out of my pocket and put it in safety." The Appellant and Garmany then got into Sissy Price's light blue Ford Granada and drove away.

On their way through Taylor Hills, the Appellant and Garmany first encountered Maria Jones, who was visiting friends in the area that day. According to Ms. Jones, the Appellant asked her whether she had seen a white man running through the area. The Appellant and Garmany continued driving until they encountered Jamie Johnson, who was in the Taylor Hills Projects helping his sister move. The Appellant asked Mr. Johnson if he had seen a white man, and then told him that the white man had stabbed a friend of his and that "he'd have it took care of."

The Appellant's companion, Greg Garmany, testified as to what happened after they left the Taylor Hills Projects. Garmany testified that he and the Appellant started driving towards an area called Mountain View. After arriving in Mountain View they came to a stop sign, where they decided to wait for a few minutes. Suddenly Johnny Dillard appeared in the distance. The Appellant called his name in an attempt to get him to come to the car. As Dillard approached, the Appellant stuck his left arm through the window holding a .25 caliber handgun and fired at least four shots in Dillard's direction. Garmany testified that he did not know that the Appellant intended to shoot Dillard and that he turned his head away when the Appellant fired the gun. The Appellant and Garmany then left Mountain View and first drove towards Graysville and then turned towards Oster Hill, where the Appellant threw the .25 caliber handgun into some bushes.[2] The Appellant then drove back to Taylor Hills and went to his residence where he was questioned by the police later that evening.

At the scene of the shooting, Dillard apparently managed to walk to a residence on Old Graysville Road. By then the blood loss made him too weak to continue further and he collapsed behind the residence. Maria Poinsett, who was babysitting at the Old Graysville Road residence, discovered Dillard's body between 6:00-6:30 p.m.

---

[2]     Greg Garmany later showed the police where he said the Appellant threw the gun, but in spite of a thorough search the murder weapon was never found.

She called her parents who notified the authorities. The Medical Examiner testified at trial that Johnny Dillard suffered at least three fatal gun shot wounds and that each one of the three wounds would have been sufficient to cause Dillard's death.

The Appellant was later indicted and arrested for the murder of Johnny Dillard. A jury of his peers found him guilty of first degree murder and he was sentenced to life imprisonment in the Tennessee Department of Corrections.

*State v. Hyatte,* 1997 WL 53454, at *1-2.

### B.      Facts from Post-Conviction Hearing

The facts from the state post-conviction evidentiary hearing are taken from the decision of

the appellate court:

A hearing was held in the post-conviction court. At the hearing, the Petitioner testified that trial counsel requested to be his attorney and informed the Petitioner's wife that he would represent the Petitioner. The Petitioner first encountered trial counsel after his December 8, 1993 arrest while he was incarcerated in the county jail. The Petitioner asserted that this meeting lasted about "15, 20, 30 minutes. It wasn't long." According to the Petitioner, trial counsel inquired if he committed the murder, to which the Petitioner said no. Trial counsel then said, "Okay," followed by, "I'll get back in touch with you."

The Petitioner confirmed that his first trial resulted in a mistrial and that he was tried again in November 1994. He testified that he did not meet trial counsel again until the day of his first trial in October 1994. He then clarified that he saw trial counsel one other time, about a week before trial, to discuss a plea bargain offer from the State. The Petitioner claimed that he asked trial counsel for his opinion about the plea offer, and trial counsel stated that "he could beat the case" and to take the case to trial.

The Petitioner testified that, at his initial interview, trial counsel questioned him about where he had been on the day of the murder, and the Petitioner provided the details of that day to trial counsel. Moreover, the Petitioner gave trial counsel the names of witnesses who could verify his whereabouts. According to the Petitioner, trial counsel interviewed only the Petitioner's wife, brother, and sister, but he did not question any of the other witnesses provided by the Petitioner. When asked if trial counsel informed the Petitioner of the results of these interviews, the Petitioner responded that he did not and that he attempted to contact trial counsel by telephone, to no avail. According to the Petitioner, trial counsel "said that he didn't want to talk over the telephone, because he felt that his phone was bugged. He put it like, they were watching him, and I didn't know who they were." The Petitioner's wife also

7

tried to contact trial counsel but was unsuccessful.

The Petitioner testified that numerous witnesses were called to testify at his trial, including at least four or five witnesses, some family members, on his behalf. According to the Petitioner, his witnesses testified to an alibi, that he was at home when the killing occurred.

During his trial, trial counsel and the Petitioner discussed the Petitioner's right to testify on his own behalf. When asked about the content of this discussion, the Petitioner relayed, "[H]e'd asked for a recess for a few minutes to get basically a cigarette break, and we went outside and I told him I needed to testify, because ... I felt that the State witnesses were lying and I needed to get on the stand to defend myself."

According to the Petitioner, trial counsel advised the Petitioner not to testify and, thereafter, the two men argued because the Petitioner insisted in his desire to take the stand. Trial counsel then stated the Petitioner, "I'll tell you what we'll do, we're going to put you on the stand.... As soon as we get in there I'm going to ask the [j]udge to give me some extended time so I can prepare you as a witness."

The Petitioner testified that his testimony at trial was necessary to rebut the testimony of Bobby Combs, Maria Jones, Jamie Johnson, and particularly, Greg Garmany. When asked how his testimony would have rebutted Garmany's, the Petitioner replied that Garmany was lying, as the Petitioner did not accompany Garmany and did not do any of the things Garmany said he did. Moreover, the Petitioner wanted to convey to the jury that he was at his home lying on his couch, thereby contradicting the testimony of Maria Jones and Jamie Johnson.

However, once they returned to courtroom after the break, they sat down and "the next thing [the Petitioner] knowed [sic] there were closing arguments." The Petitioner testified that he "missed a beat" and that trial counsel did not "say anything about [the Petitioner] wanting to testify or anything. Didn't ask for any time ... to get prepared or anything." According to the Petitioner, he was not "given a choice." Furthermore, the Petitioner was not questioned in open court about his desire to testify on his own behalf.

During the trial proceedings, trial counsel was romantically involved with the Petitioner's sister. According to the Petitioner, he became aware of this relationship when trial counsel failed to show up for a motion hearing, and his wife informed him of the relationship. The relationship ended during trial counsel's representation of the Petitioner on appeal. The Petitioner testified that, following their separation, trial counsel would not accept the Petitioner's telephone calls and would not reply to the Petitioner's letters.

After the trial, the Petitioner wrote a letter to the trial judge and to the Board of Professional Responsibility regarding trial counsel's representation. The Petitioner testified that counsel did not keep him informed about his appeal and that the denial of his right to testify was not raised as an issue on appeal.

On cross-examination, the Petitioner acknowledged that trial counsel's first action in this case was to file a motion to get the Petitioner released on bond but that the motion was unsuccessful. Trial counsel also filed a motion to suppress the Petitioner's statements to Officer Billy Cranfield and other motions.

The Petitioner confirmed that Michael Hyatte, one of the Petitioner's proposed alibi witnesses, had some felony convictions at the time of trial, which may have been the reason trial counsel did not call him to testify. The Petitioner further acknowledged that trial counsel did present witnesses in support of the Petitioner's alibi defense. The Petitioner opined that the State's witnesses changed their testimony from the first trial. The Petitioner also asserted that he had proof that some of the State's witnesses were lying.

The Petitioner acknowledged that he had a previous criminal history, which could have been used against him if he chose to testify. Moreover, one of the "main grounds" raised in his motion for a new trial and as an issue on direct appeal concerned the Petitioner's election not to testify-the jury improperly considered his decision not to testify in rendering its verdict. As additional grounds for relief in the motion for a new trial, defense counsel alleged that the trial court erred in refusing to suppress the Petitioner's statement, alleged a violation of double jeopardy, alleged that the jury was the victim of terrorist threats, alleged insufficient proof, and alleged that Greg Garmany was under the influence of narcotics and drugs.

The Petitioner confirmed that he proclaimed his innocence throughout the trial. The Petitioner asserted that trial counsel did not do enough to attack Garmany at trial. According to the Petitioner, if trial counsel had interviewed the State's witnesses, then counsel would have discovered who was present on the scene when the victim was killed.

The State showed the Petitioner a letter he wrote to the trial judge inquiring about the status of his notice of appeal. In the letter, the Petitioner states, "I feel [trial counsel] did a fairly decent job more perhaps as good a job as possible for him, but, I no longer have any confidence in him to permit him to handle the appeal." The Petitioner acknowledged that he signed the letter but maintained that he did not make that statement. According to the Petitioner, someone else typed the letter for him because he could not type.

On redirect examination, the Petitioner testified that he also conversed with trial counsel by telephone on two or three occasions. However, he claimed that trial

9

counsel stated he could not talk or discuss the case over the telephone and that trial counsel would not come to the jail. He also stated that he did not have any discussions with trial counsel about the case after his first trial.

The Petitioner stated that he was not aware of trial counsel's ineffectiveness when he signed the letter. He also clarified that he did not like the wording of the letter but that he signed it anyway.

The Petitioner opined that trial counsel did not do a good job in representing him. A time sheet reflecting the amount of time trial counsel worked on the Petitioner's case was entered into evidence. The document showed that trial counsel spent 32.3 "out of court" hours and 21.0 "in court" hours working on the Petitioner's case. The Petitioner stated that this information would have affected his opinion about trial counsel's representation before he signed the letter.

The Petitioner then called Graham Swafford to testify as an expert. Mr. Swafford stated that he had tried murder cases in the Twelfth Judicial District and that he was familiar with the standard of care for a defendant in a criminal case. Mr. Swafford confirmed that, in 1993, a criminal defendant did not testify under oath and on the record regarding waiver of his right to testify. Mr. Swafford testified that, if a defendant clearly expressed a desire to testify in spite of counsel's advice not to do so, then the standard of care required counsel to allow the defendant to take the stand on his own behalf. If trial counsel did not allow the Petitioner to testify, then the Petitioner was denied his constitutional right to testify in his own defense.

Mr. Swafford further opined that trial counsel's relationship with the Petitioner's sister was improper. When asked about trial counsel's preparation, Mr. Swafford responded, "Thirty-two point three (32.3) ["out of court" hours] for a first degree murder case, that's clearly inadequate for a number of reasons and that is not consistent with the standard of care anywhere." He also commented that the time sheet did not reflect any time spent preparing the witnesses to testify, which was "very important" preparation for trial. Regarding the amount of time trial counsel spent discussing the plea offer with the Petitioner (1.6 hours), Mr. Swafford stated the amount of time was insufficient and fell below the standard of care. Mr. Swafford also relayed that, based upon the Petitioner's testimony at the post-conviction hearing, trial counsel did not spend enough time with the Petitioner discussing his case.

On cross-examination, Mr. Swafford was asked about trial counsel's reputation, responding as follows: "I was aware of his reputation, and I was aware that it was a reputation that at times it was a good reputation and I was aware at times it was a

questionable reputation."[3]

Trial counsel did not testify at the post-conviction hearing.

After hearing the evidence presented, the post-conviction court denied relief by written order of November 21, 2007.[4] This appeal followed.

*Hyatte v. State*, 2009 WL 55917, at *2 -6.[5]

## IV.   ANALYSIS

Petitioner's pleadings are confusingly pled and his claims are difficult to decipher.  After thoroughly reviewing Petitioner's pleadings, the Court generally discerns the same claims as Respondent's counsel discerned from the pleadings.  Petitioner asserts the following grounds for relief: (1) ineffective assistance of counsel based on counsel's alleged (a) failure to question a witness at trial, (b) failure to present evidence to the jury supporting an alibi defense, (c) misconduct in having a "relationship" with Petitioner's sister, and (d) failure to allow Petitioner to testify at trial; (2) denial of due process due to the trial court's failure to instruct the jury on all lesser included offenses; (3) insufficiency of the evidence; (4) denial of fundamental right to testify at trial; (5) prosecutorial misconduct; and (6) failure of trial court to instruct the jury on accomplice testimony.

### A.   Ineffective Assistance of Counsel

---

[3]      An additional hearing was held on March 10, 2005. The hearing concerned trial counsel's alleged ineffectiveness regarding presentation of a videotape. At the conclusion of the hearing, the issues were summarized, and each side gave closing arguments. The post-conviction court reserved ruling on the issues.

[4]      The post-conviction trial court framed the issues as follows: (1) The trial court failed to instruct the jury as to the defense of alibi; (2) The trial court failed to properly instruct the jury as to the lesser included offenses of the indicted offense of murder in the first degree; (3) The Petitioner was denied his constitutional right to testify in his own behalf at trial; and (4) The Petitioner was denied his constitutional right to the effective assistance of counsel at trial.

[5]      The Court observes that Michael Hyatte, Petitioner's brother, did indeed testify on Petitioner's behalf during his jury trial [Addendum No. 1, Vol. 6, at 438-456].

Petitioner raises several alleged instances of ineffective assistance of counsel. After addressing the applicable law, the Court will address each alleged instance of ineffective assistance.

        1.    *Applicable Law*

In order to demonstrate ineffective assistance of counsel, a petitioner must show not only his attorney's representation fell below the standard of competence demanded of attorneys in criminal cases but also a reasonable probability that, but for the attorney's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *McMann v. Richardson*, 397 U.S. 759, 771 (1970). The *Strickland* test requires a defendant demonstrate two essential elements: (1) counsel's performance was deficient, i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id*. at 687-88.

As the Sixth Circuit explained in *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied*, 508 U.S. 975 (1993): "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *See also West v. Seabold*, 73 F.3d 81, 84 (6th Cir.), *cert. denied*, 518 U.S. 1027 (1996). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Id.* (quoting *Strickland*, 466 at 691) (citing *Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990)). There is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

The Court cannot indulge in hindsight, but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690. Trial counsel's tactical decisions are particularly difficult to attack. *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *O'Hara*, 24 F.3d at 828. Effective assistance of counsel is presumed, and the Court will not generally question matters involving trial strategy. *See United States v. Chambers,* 944 F.2d 1253, 1272 (6th Cir. 1991), *cert. denied*, 502 U.S. 1112 (1992).

Therefore, to prove deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under the then "prevailing norms of practice." *Strickland,* 466 U.S. at 688. When evaluating counsel's performance, the Court is mindful of the *Strickland* Court's instructions that "[t]here are countless ways to provide effective assistance of counsel. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* In addition, the American Bar Association ("ABA") Standards for Criminal Justice are "guides to determining what is reasonable." *Rompilla v. Beard,* 545 U.S. 374, 387 (2005); *Wiggins v. Smith,* 539 U.S. 510, 524 (2003); *Strickland,* 466 U.S. at 688.

"[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998), (quoting *Strickland v. Washington*, 466 U.S. at 690). The Court must make an independent judicial evaluation of counsel's performance, and determine whether counsel acted reasonably under all the circumstances. *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321-22 (6th Cir. 1993).

13

"Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) *cert. denied*, 523 U.S. 1079 (1998) (citing, *Strickland*, 477 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984)). To establish the prejudice prong, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

2.  *Ineffective Assistance of Counsel Claims*

a.  Failure to Question a Witness

Petitioner contends trial counsel was ineffective for failing "to question the witness that could have proven that the petitioner was in fact with them [sic] at the time of the murder in the case which would have changed the outcome of the trial in this case[.]" (Court File No. 3, at 19).[6] Although Petitioner has not identified the witness to whom he is referring or the content of the witness's proposed testimony, it does not appear that he raised this particular claim in the state court. The state appellate post-conviction court explained its rejection of Petitioner's ineffective assistance of counsel claims as follows:

> In this appeal, the Petitioner contends that the representation he received from his trial counsel was ineffective. The Petitioner's general allegations can be summarized as follows: (1) trial counsel failed to adequately prepare for trial; (2) trial counsel failed to meet with him a sufficient number of times; (3) trial counsel failed to discuss the facts of the case and possible defense strategies with him; (4) trial

---

[6]    The Court notes Petitioner's May 19, 2008, post-conviction appellate brief includes a paragraph explaining that unprofessional conduct claims were filed in March and November 1997, and on February 13, 1998, petitioner's trial counsel, Nathan Brooks, was disbarred upon his agreement to a two-year suspension from the practice of law and remains disbarred as of May 19, 2008 [Addendum No. 4, Document 1, at 26].

counsel failed to investigate the Petitioner's case by interviewing potential alibi witnesses;
and (5) trial counsel's relationship with the Petitioner's sister created a conflict of interest in counsel's representation of him at trial and on direct appeal.

The post-conviction court again made detailed findings on the issue and found that the Petitioner received the effective assistance of counsel, concluding as follows:

It is clear from the record in this cause that [the] Petitioner's [c]ounsel did much more in the defense of this matter than the Petitioner would credit him. Defense [c]ounsel filed numerous pre-trial motions, including, among other [s], [m]otions to [s]uppress [s]tatements, [c]ompel [p]roduction of [e]vidence, [m]otions for [d]iscovery, and [n]otice of an [a]libi [d]efense, supported by a list of potential witnesses. Defense [c]ounsel presented the classic case of [a]libi in this cause, and further, did an effective job of challenging the credibility of the State's primary witnesses. Defense [c]ounsel was further able to produce evidence which indicated the existence of another person who possesses far more motive to do the victim harm than did the Petitioner. The allegations that [d]efense [c]ounsel failed to adequately confer with the Petitioner, and failed to adequately investigate the case are not supported by the record in this cause. It is clear that [d]efense [c]ounsel did, in fact, investigate the case, as he was able to produce various witnesses who attempted to establish an [a]libi for the Petitioner at the time of the homicide. Counsel was further able to produce evidence which indicated that at least one of the State's potential witnesses could not have been present in Rhea County at the time of the commission of the offense in this case, thereby discrediting the testimony of another State's witness who asserted that the other person was, in fact, present.

In all fairness, it is difficult for the [c]ourt to see what additional efforts [d]efense [c]ounsel could have made in order to properly defend his client in this case.

The Petitioner alleges that his [d]efense [c]ounsel carried on some type of "relationship" or "affair" with the Petitioner's sister during the trial of this case, and that the same continued until this case was in the process of direct appeal. This is an assertion which is not corroborated by independent proof. However, assuming the allegation to have a basis in fact, it does not appear that this "relationship" prevented [the] Petitioner's [c]ounsel from providing the Petitioner with effective representation. While on its face, such a situation might be seen as inappropriate behavior on the part of [the] Petitioner's [c]ounsel, there is simply nothing in this record which would show that as a result of this situation, [the] Petitioner's [c]ounsel failed to afford the Petitioner effective representation in the trial of this case.

Again, the record supports the post-conviction court's findings. The Petitioner's testimony was cumulative to his alibi defense and would mostly likely not have aided in his defense. The proof showed that trial counsel and the Petitioner met to prepare

15

for trial and that the lines of communication were open and used by both the Petitioner and his trial counsel, allowing the Petitioner to make well-informed decisions and assist in his defense. The record does not establish that an actual conflict existed by trial counsel's relationship with the Petitioner's sister and, moreover, there is no proof that the relationship had any effect upon his representation of the Petitioner.

*Hyatte v. State,* 2009 WL 55917, at *9-10.

Aside from Petitioner's failure to comply with Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts, Petitioner did not raise this particular claim in state court. Consequently, Petitioner's claim that trial counsel was ineffective for failing "to question the witness that could have proven that the petitioner was in fact with them at the time of the murder in the case which would have changed the outcome of the trial in this case" will be dismissed for two reasons (Court File No. 3, at 19).

First, Petitioner's presentation of this claim does not comply with the habeas rules. Rule 2(c) of the Section 2254 Rules provides, in pertinent part, that the petition must "(1) specify all the grounds for relief available to the petitioner; [and] (2) state the fact supporting each ground[.]" Notice pleading is not permitted in habeas petitions. Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, Advisory Committed Notes, 1976 Adoption, ¶ 3; *Blackledge v. Allison*, 431 U.S. 63, 75-76, n. 7 (1977) ("Notice pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error.) (Citation and internal punctuation omitted).

Moreover, for the Court to properly consider this claim, Petitioner needed to present the unidentified alibi witness to the state post-conviction court to testify that Petitioner was with him/her at the time of the murder. Courts cannot speculate on what benefit a witness might offer to petitioner's case or guess as to what evidence further investigation may have uncovered.

16

Petitioner's failure to put forth any proof to indicate counsel performed deficiently in failing to present this unidentified witness or what prejudice he suffered as a result of any alleged deficiency on the part of counsel, is fatal to his claim. In sum, even assuming this claim is properly before the Court, it is not alleged with sufficient specificity to permit an evaluation of its merits, as Petitioner has failed to identify the witness to whom he is referring and present the content of the proposed testimony.

Second, this specific claim was not properly raised in Petitioner's state post-conviction proceeding and on appeal. Aside from the fact Petitioner did not identify a specific witness he claimed counsel should have presented at trial, he failed to present any new witness during state post-conviction proceedings to support his alibi defense. Consequently, this claim is barred by procedural default because Petitioner did not properly raise this claim in state court and because there is no remaining procedural device for presenting such a claim there.

To avoid procedural default, at a minimum, a petitioner must "invoke one complete round of the State's established appellate review process" for each of his claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Tennessee, this means one full round of appeal up to and including filing an appeal in the Tennessee Court of Appeals. Because Petitioner never raised this specific claim in state court, it is procedurally defaulted. Petitioner does not address the procedural default or show any cause and prejudice or a fundamental miscarriage of justice to excuse his default on this claim.

Accordingly, Petitioner's claim that counsel was ineffective for failing "to question the [unidentified] witness that could have proven that Petitioner was in fact with them [sic] at the time of the murder" will be **DISMISSED** for failure to comply with Rule 2(c) of the Section 2254 Rules

and alternatively as procedurally defaulted, and Respondent will be **GRANTED** summary judgment on this claim.

b.     Ineffective Presentation of Alibi Defense

Petitioner contends trial counsel "could have put all the evidence to the jury on the alibi defense that shows his . . . innocence." (Court File No. 3). Petitioner, however, does not identify "all the evidence" and the Court is unable to determine to what Petitioner is referring.[7]

The state post-conviction court concluded defense counsel presented the classic case of alibi, challenged the credibility of the state's witnesses, and presented evidence indicating another person had far more motive than he did to harm the victim. The appellate court affirmed the post-conviction trial court's finding that Petitioner did not receive ineffective assistance of counsel, and concluded Petitioner failed to demonstrate he was entitled to post-conviction relief. *Hyatte v. State*, 2009 WL 55917, at *9-10.

The state appellate court's decisions is somewhat convoluted as it intertwined the discussion of all the alleged instances of ineffective of assistance of counsel in reaching its conclusion that Petitioner "failed to demonstrate he is entitled to receive post-conviction relief." *Id.* at *10. Although not clearly stated, as the Court understands the state court decisions, both courts concluded Petitioner did not demonstrate deficient performance on the part of counsel, thus neither court specifically analyzed the prejudice prong of his ineffective assistance of counsel claims. For the reasons explained below, the Court concludes that, under the AEDPA standard the state appellate

---

[7]     Although the Court is unable to located a notice of alibi defense in the record, during the state post-conviction proceeding the prosecutor stated that trial counsel filed a notice of an alibi defense supported with a list of potential witnesses, and the post-conviction trial court so found [Addendum 3, Vol. 1, at 98; Addendum 3, Vol. 2, at 31).

court's finding that counsel did not perform deficiently in his presentation of the alibi defense was reasonable, and even assuming counsel was deficient, Petitioner has not demonstrated he was prejudiced by counsel's alleged inadequacies.

Defense counsel presented several witnesses in support of an alibi defense. Although defense counsel did not present Petitioner's eleven (11) year-old son, Floyd Leon Hyatte, Jr. ("Leon"), as an alibi witness, as he only presented Leon's testimony that he saw Mr. Dillard, the victim, running in a stooped position besides some woods in the vicinity of his residence on February 14, 1993, on cross-examination Leon's testimony supported Petitioner's alibi defense. Leon testified his father and Garmany walked to Ms. Wilkerson's driveway after being told Mr. Dillard had run in that direction, but both men walked back to Petitioner's house. Leon further testified Petitioner remained at home and did not leave in Sissy's blue car, but someone who he did not see left in the car [Addendum No. 1, Vol. 5, at 3383-86].

Defense counsel also presented Petitioner's neighbor, Donnie Steve Sharp ("Mr. Sharp"), who lived next door. Mr. Sharp testified he saw Petitioner right after church on February 14, 1993, and went over to his house. Mr. Sharp stayed at Petitioner's house about an hour before going home. Mr. Sharp testified he never saw Petitioner leave that day [Addendum No. 1, Vol. 5, at 392]. Mr. Sharp also testified one night when Sissy was partying, he heard her say she wished the victim had not been killed, and that it was her fault [Addendum No. 1, Vol. 5, at 393].

Peggy Hyatte, Petitioner's wife, also testified on his behalf as an alibi witness. Mrs. Hyatte testified Petitioner was passed out on the couch most of the day, but did wake up when she told him Mr. Dillard had stabbed Mr. Coleman [Addendum No. 1, Vol. 6, at 405-409]. Mrs. Hyatt testified the news did not phase Petitioner as he immediately went back to sleep and did not wake up until

later that evening when Sissy came in and wanted to talk to him. After his conversation with Sissy, according to Petitioner's wife, he left with Robert, Greg, and Michael to return a movie to Mrs. Penny Suttles ("Mrs. Suttles"). While Petitioner was gone, law enforcement came by looking for him and told her they had found the victim dead [Addendum 1, Vol. 6, at 410-11].

Heather Hyatt ("Heather"), Petitioner's sister-in-law,[8] testified she arrived at Petitioner's house that day about 4:00 p.m. but left soon thereafter with Petitioner's wife to go to her house to pick up a movie. When she left, Petitioner was asleep on the couch, and five minutes later when they returned because she had forgotten her house keys, he was still on the couch sleeping. Soon thereafter they left again, for approximately thirty (30) minutes, to go to her house to pick up a tape, return the tape to Showcase video, and to go to the "Jiffy." When they returned, Petitioner was still in the same place on the couch and stayed there until Sissy came to the house [Addendum 1, Vol. 6, at 426-29, 434]. According to Heather when they returned to the house it was dark and approximately ten (10) minutes later Sissy came to the house, talked to Petitioner, and then left. Soon thereafter, Petitioner, Greg, Michael, and Robert left to pick up a movie [Addendum 1, Vol. 6, at 430].

Next, Petitioner's brother, Michael Hyatte ("Michael") testified. Michael testified he and his wife arrived at his brother's house about 4:30 or 5:00 and Petitioner was passed out on the couch. Mr. Hyatt testified Petitioner never left the house prior to them taking the movies back to Mrs. Suttles, and he never left the house in a blue Ford Grenada with his co-defendant. According to Michael, he and his brother were together all afternoon and evening. Michael also testified that after

---

[8]        She is married to Petitioner's brother, Michael Hyatte.

Petitioner talked to Sissy, they went to Mrs. Suttles' house in Michael's little Metro [Addendum No. 1, Vol. 6, at 439-440].

Robert Brown ("Mr. Brown") testified on Petitioner's behalf. Although Mr. Brown admitted to drinking quite a bit on Feburary 14, 1993, he remembered he arrived at Petitioner's home about 3:30 or 4:00 that afternoon, left about 10:00 that evening, and while he was there Petitioner never left his residence [Addendum No. 1, Vol. 6, at 456-59].

Counsel presented Mrs. Suttles' testimony that Petitioner, Michael, Greg, and Sissy came to her house on February 14, 1993. Ms. Suttles was unable to identify the hour of the visit but testified it was dark outside. [Addendum No. 1, Vol. 6, at 462-63].

The record demonstrates counsel presented an alibi defense that Petitioner was with his relatives and friends at his home and did not leave with his co-defendant to commit the murder. Unfortunately for Petitioner, the jury did not believe his alibi witnesses. Because the jury did not believe Petitioner's alibi defense does not render trial counsel's representation of the Petitioner ineffective. Petitioner has not demonstrated, and it does not otherwise appear, that the Tennessee appellate court's rejection of this claim contravened or unreasonably applied clearly established federal law. After a thorough review of the record, the Court concludes the state appellate court's conclusion that counsel provided effective assistance is supported by the record.

Even assuming counsel was ineffective for failing to present a stronger alibi defense, Petitioner has failed to demonstrate he suffered any prejudice, as there is nothing before the Court that even suggests a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Petitioner

did not present the testimony of any witness during his state post-conviction proceedings to bolster his alibi defense. In addition, Petitioner's post-conviction testimony regarding the testimony he wanted to present to the jury–testimony which did not detail his movements, whereabouts, and actions during the pertinent time period, but rather were general statements that the other testimony was not true–did not bolster his alibi defense or identify any witness counsel should have presented at trial in his defense. Consequently, there is no evidence a reasonable probability exists that a different verdict would have resulted if counsel had presented some other unidentified alibi evidence. There is nothing before the Court that undermines its confidence in the outcome of Petitioner's trial.

Therefore, the state appellate court neither unreasonably applied *Strickland* nor unreasonably determined the facts in rejecting Petitioner's claim that counsel ineffectively presented his alibi defense. Accordingly, Respondent's motion for summary judgment on Petitioner's claim counsel ineffectively presented his alibi defense will be **GRANTED** and Petitioner's claim will be **DISMISSED.**

c. Attorney's Alleged Relationship with Petitioner's Sister

As with his other claims, Petitioner's allegation that trial counsel had a relationship with his sister is confusingly pled. Petitioner contends counsel engaged in misconduct because he had a relationship with his sister (Court File No. 3). Petitioner, however, has submitted no credible proof that counsel was engaged in a relationship with his sister.

The post-conviction trial court found Petitioner's assertion that counsel had a "relationship" with his sister was not corroborated by independent proof. The court, noting that such a relationship would be inappropriate behavior on the part of Petitioner's counsel, nevertheless, concluded that

22

even assuming the allegation was true, there was no showing the relationship prevented counsel from providing effective representation [Addendum 2, Doc. 6, at 98-99]. The appellate court found the record does not establish an actual conflict existed by trial counsel's relationship with Petitioner's sister and, moreover, there is no proof that the relationship had any effect upon his representation of the Petitioner. Therefore, the appellate court affirmed the trial court's finding that Petitioner failed to demonstrate counsel failed to afford him effective representation during trial. *Hyatte v. State,* 2009 WL 55917, at *10.

The Court initially notes the testimony about counsel's alleged relationship with Petitioner's sister is hearsay. There is no credible evidence in the record indicating Petitioner's trial counsel had an inappropriate relationship with Petitioner's sister. The only evidence is Petitioner's testimony based on what he alleges his wife told him. During his state post-conviction hearing, counsel asked Petitioner what was the "issue that arose about a relationship that Mr. Brooks was having with your sister?" Petitioner explained:

> Well, I found out - - we had a hearing, I was suppose to been here for a hearing. Was that after the trial, though? A motion, it was a motion I was suppose to been so. [sic] Nobody showed up. Nobody came to get me. So I called my wife and I asked her, I said, "Have you seen or heard from Nathan?"
>
> And she said, "Well, yeah, he's down at your sister's?"
>
> And I said, "Well, what's he doing down there?"
>
> She said, Well, they been seeing each ever since they met, you know, when he interviewed her the first time.

When post-conviction counsel asked Petitioner if his trial counsel in fact had a relationship with his sister, he responded, "Yes, I believe so." "Something happened. It started over a pack of cigarettes as far as I know." Petitioner further explained they broke up and he never could get in

touch with counsel [Addendum 3, Vol. 2, at 22-23].

Petitioner's testimony about what someone else told him is insufficient to meet his burden of proof as to his allegation counsel had an inappropriate relationship with his sister. The state courts' conclusion–that Petitioner's complaint about his trial attorney's alleged relationship with his sister was not corroborated by independent proof, but even if a relationship did occur, there is no evidence the relationship prevented counsel from providing effective representation–is reasonable based on the record. Aside from the fact there is no credible evidence trial counsel was involved in an inappropriate relationship with Petitioner's sister, there is nothing in the record from which the Court is even able to infer, that Petitioner suffered any prejudice as a result of this alleged relationship.

Having thoroughly reviewed the entirety of the records from Petitioner's trial, direct appeal, and state post-conviction proceedings, the Court concludes Petitioner has not demonstrated the state court's decision was an unreasonable determination of the facts or was an unreasonable application of *Strickland*. Moreover, there is not one shred of evidence indicating Petitioner suffered any prejudice as a result of this alleged relationship. Accordingly, Respondent's motion for summary judgment on Petitioner's claim that trial counsel was ineffective based on his alleged inappropriate relationship with Petitioner's sister will be **GRANTED** and this claim will be **DISMISSED**.

d.    Failure to Allow Petitioner to Testify at Trial

Petitioner contends counsel was ineffective for not allowing him to testify. At the outset, the Court notes Petitioner's claim he was denied the right to testify was raised and addressed in a very convoluted manner on post-conviction appeal. The trial court addressed the claim as a denial of Petitioner's constitutional right to testify on his own behalf at trial and "as an adjunct, whether

24

his counsel was ineffective in not allowing the Petitioner to so testify." [Addendum No. 3, at 90].

The following is the post-conviction trial court's analysis:

> The proof shows that this case was, in fact, tried twice, the first trial having ended when the Court declared a mistrial at the conclusion of the State's proof, due to improper Jury separation. At the second trial the Petitioner did not take the stand in his own behalf, and the Court instructed the trial Jury that they should place no significance on this fact. The Petitioner was represented at both trials by the same Attorney, Mr. Nathan Brooks.

> After the Petitioner's conviction, the Petitioner's Counsel, both at the hearing of the Motion for New Trial in this case, and on direct Appeal, argued the trial Jury improperly considered the Petitioner's failure to testify in his own behalf. This issue was overruled by this Court, and the said ruling was affirmed on direct Appeal to the Tennessee Court of Criminal Appeals. At no time did the Petitioner indicate that he had, in fact, desire to testify in his own behalf; or that he was wrongfully prevented from so doing by his Counsel. In fact, the Petitioner even wrote a letter to this Court after his conviction, expressing his satisfaction with the representation afforded him by his trial counsel.

> It is obvious from the proof in this record that Counsel's decision not to put the Petitioner on the stand to testify in his own behalf was a tactical decision based upon numerous factors. First, Counsel for the Petitioner had presented a two pronged defense. Counsel first presented, through various witnesses, a Defense of Alibi on behalf of the petitioner. Counsel also engaged in a careful cross-examination of the State's key witnesses in an effort to discredit the reliability of their testimony which connected the Petitioner to the homicide in question. Second, defense Counsel placed proof before the Jury which would indicate that another person had more of a motive to kill the victim in this case than did the Petitioner, and suggested that the other person was, in fact, the actual killer.

> Once the Alibi defense had been established by the various Defense witnesses, the Petitioner could only have testified in line with the evidence already presented in this regard, thus making this testimony only cumulative. Further, by testifying, the Petitioner would have been subjected to cross-examination by the State, and would, in essence, have been forced to either agree that the State's witnesses who placed him in pursuit of the victim, and at the scene of the homicide were correct, (a highly unlikely situation), or assert that the witnesses were either all lying or all mistaken. It cannot be said that would have placed the Petitioner in the most favorable light in the Jury's eyes. Additionally, it is to be noted that the State, (proper notice of potential impeachment having been filed), would have been able to cross-examine the Petitioner as to prior criminal convictions, which included convictions for the felonies of Theft, and robbery, which would have seriously reflected on the

25

Petitioner's credibility. Under the circumstances, it is readily apparent as to why Petitioner's Counsel would not have wanted him to testify in his own behalf.

[Addendum No. 3, Vo. 1, at 96-97].

On state post-conviction appeal, Petitioner did not raise this as an ineffective assistance of counsel claim, but rather, raised it as a constitutional violation on the part of the trial court which the state appellate court concluded was procedurally defaulted because it was not raised on direct appeal. Yet, the appellate court proceeded to analyze the claim, agreeing with the state post-conviction court's conclusion that any error was harmless, and seemingly addressing the claim that counsel was ineffective for failing to permit Petitioner to testify on his own behalf when it concluded "Petitioner has failed to prove by clear and convincing evidence that he suffered prejudice necessary to establish ineffective assistance of counsel." *Hyatte v. State,* 2009 WL 55917, 7-9. On appeal, the Tennessee Criminal Court of Appeals addressed the "right to testify" issue as follows:

> The Petitioner contends he informed trial counsel that he wanted to testify on his own behalf, but trial counsel rested the case without allowing the Petitioner to take the stand. The Petitioner contends that the trial court denied him his right to testify in his own defense in violation of the constitutional requirements set forth in *Momon*, 18 S.W.3d 152.
>
> The State argues the Petitioner has waived this issue by failing to present it on direct appeal. Failure to present a ground for relief on direct appeal constitutes waiver absent certain circumstances inapplicable to the Petitioner's case. *See* Tenn.Code Ann. § 40-30-106(g). Initially, we conclude the Petitioner has waived this issue. In any event, the procedural requirements set forth in *Momon* would afford the Petitioner no relief in this case.
>
> In *Momon*, our supreme court recognized that "the right of a criminal defendant to testify in his or her own behalf is a fundamental constitutional right." 18 S.W.3d at 161. Accordingly, "the right may only be waived personally by the defendant." *Id*. Because the right to testify is both fundamental and personal, it "may only be waived if there is evidence in the record demonstrating 'an intentional relinquishment or abandonment of a known right or privilege.'" *Id*. at 162 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Thus, "[t]he waiver of a fundamental right will not be presumed from a silent record, and the courts should

26

indulge every reasonable presumption against the waiver of a fundamental right." *Id*. (citations omitted).

However, the trial in this case occurred prior to *Momon*, and *Momon* has no retroactive effect. *Id*. at 162-63 (holding "that neither the right to testify discussed herein, nor the procedural protections adopted to preserve that right are new constitutional rules which must be retroactively applied"). Nonetheless, if the Petitioner was actually denied his right to testify by his trial counsel, there is constitutional error. *Id*. Thus, while the 'prophylactic' procedures set forth in *Momon* are not mandatory in the present case, we nonetheless refer to the principles expressed in the case as guidelines. *See Terrance B. Smith v. State*, No. W2004-02366-CCA-R3-PC, 2005 WL 2493475, at \*6 (Tenn.Crim.App., Jackson, Oct. 7, 2005). The *Momon* Court provided instructive, nonexclusive factors to assist a court in determining whether an error in denying a defendant his right to testify is harmless beyond a reasonable doubt: (1) the importance of the defendant's testimony; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; and (4) the overall strength of the prosecution's case. 18 S.W.3d at 168.

In this case, trial counsel did not testify, and other than the Petitioner's testimony, the record is sparse as to whether the Petitioner personally waived his right to testify at trial. *See also Derrick Quintero v. State*, No. M2005-02959-CCA-R3-PD, 2008 WL 2649637, at \*42 (Tenn.Crim.App., Nashville, July 7, 2008, *perm. to appeal granted in part and denied in part* (Tenn. Dec. 12, 2008). The post-conviction court essentially conducted a harmless error analysis[.] . . .

We agree with the thorough analysis of the post-conviction court and conclude that any error in this respect was harmless beyond a reasonable doubt. Moreover, the harmless nature of the error results in the conclusion that the Petitioner has failed to prove by clear and convincing evidence that he suffered prejudice necessary to establish ineffective assistance of counsel. *See Smith*, 2005 WL 2493475, at \*9.

*Hyatte v. State,* 2009 WL 55917, 7-9.

Discerning that the appellate court addressed the ineffective assistance of counsel claim, although in a very tortuous manner, it appears the Tennessee Court of Criminal Appeals standard placed too great a burden of proof on the defendant to show prejudice. Arguably, the appellate court's clear and convincing evidence of prejudice standard required Petitioner to show more than a reasonable probability of prejudice as to claim counsel was ineffective for denying him the right

27

to testify.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court, concluding the state court had erred by holding the petitioner to an erroneous legal burden in relation to the prejudice prong of an ineffective assistance claim, engaged in a *de novo* review of Petitioner's ineffective assistance of counsel claim. Following the Supreme Court's lead, the Court will likewise engage in a *de novo* review of Petitioner's ineffective assistance of counsel claim. *Id*. at 396-98; *Magana v. Hofbauer*, 263 F.3d 542, 551 (6th Cir. 2001) (engaging in de novo review after concluding the state court placed too great a burden of proof on defendant to show prejudice).

Initially, the Court notes the state court trial record does not support Petitioner's post-conviction testimony regarding the facts surrounding this claim. During his state post-conviction hearing, Petitioner testified counsel "asked for a recess for a few minutes to get basically a cigarette break, and we went outside and I told him I needed to testify, because the State's witnesses, I felt that the State witnesses was [sic] lying and I needed to get on the stand to defend myself." [Addendum No. 3, Vol. 2, at 19]. Petitioner explained counsel advised him not to testify but he kept insisting he needed to testify, and he and counsel actually got into an argument about him testifying because he was insisting on testifying and counsel did not want him to testify. Petitioner told counsel he needed to rebut the testimony of Bobby Combs, Maria Jones, Jamie Johnson, and Greg Garmany. Most definitely Greg Garmany." According, to Petitioner, counsel finally agreed and said as soon as we get in there I'll "ask the Judge to give me some extended time so I can prepare you as a witness." [Addendum No. 3, Vol. 2, at 20]. Petitioner further testified that upon returning to the courtroom, they sat down, there was no mention in court about him testifying, and the next thing he knew "there were closing arguments" [Addendum No. 3, Vol. 2, at 20-21].

28

A review of the trial transcript reflects that after defense counsel presented witnesses on Petitioner's behalf, he approached the bench and defense counsel inquired about a hearing on his motion in limine concerning the admissibility of Petitioner's prior convictions as "that's, of course, vital on whether or not I put my client on" [Addendum No. 1, Vol. 6, at 471-72]. A hearing was conducted and the trial court ruled that all three prior convictions would be admissible for impeachment purposes and then the trial judge said, "Let's take about five minutes." They adjourned for seven minutes.[9] Upon their return, counsel stated the defendant rested, the prosecution stated they had no rebuttal, the trial judge immediately explained to the jury that they were stopping for the night and would return the next morning for closing argument and the jury charge, and court was adjourned for the day [Addendum No. 1, Vol. 6, at 474-77]. Therefore, the trial record clearly demonstrates Petitioner's post-conviction testimony–that upon returning to the courtroom and sitting down closing arguments began–is patently inaccurate.

There is nothing in the record that indicates upon the return from the seven minute adjournment and defense counsel's announcement that the defense rested Petitioner brought to the attention of the judge that he desired to testify. The record is not clear as to what happened during the adjournment but if Petitioner is to be believed he would have reiterated his desire to testify to defense counsel even though the judge had indicated his prior convictions could then be used against him. Upon the return to court in the face of defense counsel's surprising announcement Petitioner did nothing. After court was adjourned for the day Petitioner did nothing to bring to the attention or anyone that defense counsel had not accurately stated his desire to testify. And the next day when

---

[9]     Apparently the conversation between Petitioner and counsel regarding Petitioner testifying took place during this break, as the record reflects no break was taken the next day when court reconvened until the jury was discharged to deliberate after receiving jury instructions.

court resumed for closing arguments Petitioner again did nothing to correct defense counsel's statement and demonstrate his desire to testify in his own behalf.

In addition, the record indicates it is doubtful that counsel deficiently prohibited Petitioner from testifying, considering the damage that likely would have been done by Petitioner's testimony. Indeed, the record supports a finding that counsel's decision was reasonable and sound trial strategy, and Petitioner's testimony alone–which did not detail the testimony he would have provided as to his movements on February 14, 1993, but rather consisted of his testimony identifying the testimony of other witnesses that he said was not true–did not overcome that presumption. *Strickland v. Washington*, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy").

Nevertheless, for the sake of this discussion, the Court presumes counsel performed deficiently in not abiding by Petitioner's wish to testify. After a careful review of the record, however, the Court concludes Petitioner has not demonstrated a reasonable probability that, but for counsel's decision to forego putting him on the witness stand, the outcome of the trial would have been different. As detailed below, the record establishes it was not reasonably likely that Petitioner's testimony would have made any difference in light of all the circumstantial evidence of guilt and Petitioner's proposed testimony.

First, although Petitioner's alibi witnesses testified he never left the house in Sissy's blue car with his co-defendant just prior to the shooting of the victim in this case, the state's witnesses, who had no apparent loyalty to Petitioner or the victim, testified to the contrary. Second, Petitioner's

proposed testimony consisted of his disagreement with the testimony of the state's witnesses.

(1)     *State's Trial Proof*

In general, the state's proof was that Petitioner and his co-defendant left Petitioner's home in Sissy's light blue car after they were told the victim stabbed Mr. Coleman and not long before the victim was shot.  Bobby Combs, Petitioner's ten year old neighbor and friends with his children, testified he showed Petitioner and Garmany where the victim had run after stabbing Mr. Coleman, and when they returned from where he had directed them, he heard one of them say "let me get this gun out of my pocket and put it in safety." [Addendum No. 1, Vol. 2, at 48-49].  Soon thereafter, he saw the two men leave in Sissy's blue car [Addendum No. 1, Vol. 2, at 50].

Maria Antoinette Jones, who knew Petitioner only by sight because she previously had seen him three or four times, testified she saw him on Illinois Avenue on February 14, 1993, around 6:00 p.m. at her boyfriend's father's house (Mr. Wilkerson).  Ms. Jones was in Rhea County for a wedding on that date, and she was helping the wedding couple put gifts in their car when Petitioner drove up in a light blue car and asked them if they had seen a white guy run through the area, explaining that he was looking for him because one of his friends had been stabbed.   The parties said they had not seen a guy.  Petitioner and his passenger–a person Ms. Jones was unable to identify other than to say he seemed smaller than Petitioner and wore a cap–departed [Addendum No. 1, Vol. 2, at 60-68].

Jamie Lester Johnson, a twenty-four year old man who had known Petitioner for about six years, testified he was helping his sister move from Illinois Avenue on February 14, 1993. Somewhere between 6:00 p.m and 6:30 p.m. Petitioner, driving a light blue four door Ford Granada, stopped and asked them if they needed help moving and whether they had seen a white man come

31

by, explaining he had a friend at Erlanger Hospital who had been stabbed. Mr. Johnson did not know Petitioner's passenger. Petitioner helped them move a freezer during the approximately thirty minutes he was there. About thirty or forty-five minutes after Petitioner and his passenger left, Mr. Johnson heard that someone had been shot [Addendum No. 1, Vol. 2, at 70-77].

Petitioner's co-defendant, Garmany, who was twenty-seven and had known Petitioner almost all of his life, testified that while he was at Petitioner's house, Peggy Hyatte came in and hollered that Billy Coleman had been stabbed by a white man. Garmany and Petitioner got up and walked behind Robbie Wilkerson's house to look for the person who stabbed Mr. Coleman, i.e., Mr. Dillard (the victim in this case). They did not see anyone, so they walked back to Petitioner's house.

Garmany went into Petitioner's house, used the restroom, poured a cup of beer, lit a cigarette, went back outside, Petitioner told him to get in the car, he drove them towards Mountain View, then turned around and stopped at a house where some people were moving. Petitioner got out and talked to the people while Garmany stayed in the car. When Petitioner returned to the vehicle, they left and headed towards Mountain View, and Petitioner backed in at a stop sign.

After sitting backed in at the stop sign for three or four minutes, Petitioner spotted the victim, pulled out to the left hand side of Graysville Road, and yelled at the victim to come to him. When the victim walked towards the car, Petitioner stuck his arm out the window and started firing the gun, at which time Garmany urinated on himself and turned his head. Garmany testified he did not know how many times Petitioner shot the victim but he heard at least three shots. Petitioner then proceeded out towards Graysville, towards Crystal Springs, at which time Garmany told him he did not have to shoot the man. Petitioner responded he was tired, they drove toward Oster Hill, Petitioner pitched the gun over the top of the car into some bushes, they drove up and turned around

32

and came down the hill, went to the housing projects, parked the car, and went to Petitioner's house [Addendum No. 1, Vol. 4, at 245-265].[10]

Garmany testified that about 30 to 35 minutes later law enforcement knocked on the door. Later Sissy came in, she and Petitioner went in the bedroom, and then the two of them left with Petitioner's brother, Michael, in Michael's little silver Metro for about 30-45 minutes. Garmany guesstimated that it was 8:00 or 8:30 p.m. when Petitioner and Michael returned. Garmany stayed at Petitioner's house until about 10:00 or 10:30 p.m. drinking. Garmany said Petitioner told him if anyone asked to say they were at his house watching TV and movies and had not left [Addendum No. 1, Vol. 4, at 265-67].

(2)     *Petitioner's Proffered Testimony*

During his state post-conviction proceedings, Petitioner asserted he wanted to testify to give his side of the story [Addendum No. 3, Vol. 2, at 26]. When post-conviction counsel asked Petitioner, specifically what he want to testify about, he failed to respond to the question. Rather, he testified he "felt" if he gave his "side of the story, then it would be a whole different story, . . . [he] wanted to give [his] side of it." When asked what evidence he wanted to present to contradict his co-defendant's testimony he responded,

> Well, I know I wasn't with him. I don't know what, you know, he just simply told a lie. He got up on the stand and just lied. He said that I did this and I did that. Well, I didn't do any of that.
>
> . . .
>
> I wanted to let them know that I was at the house, and laying there on my couch. The only time I got up was to look out the door, and that was late in the evening.

_____

[10]     Although Garmany took an officer back to the location to look for the weapon ten months later–in December of 1993–it was never found [Addendum No. 1, Vol, 4, at 204, 268-69].

[Addendum No. 3, Vol. 2, 25-27].  In addition, Petitioner claimed Ms. Jones and Mr Johnson's testimony was inaccurate.  Petitioner stated he would have testified as follows:

> I had seen Maria Jones at my aunt's house and I was going to - - my niece was getting married and that's her grandmother, so I went to asked where Temecki was. She said she's down at the church.  I turned the car around, went to the church.  I seen Jamie Johnson across from the church with a freezer.  I said, Well, I can't go in the church.  I'd been drinking and I didn't want to go in the church drinking, so I went across the street and helped him with the freezer and then I left.

[Addendum No. 3, Vol. 2, at 27-28].  Notably, this contradicts Petitioner's testimony and his alibi witnesses that he was at his house laying on the couch until late that evening, as both Ms. Jones and Mr. Johnson testified they saw Petitioner between 6:00 p.m. and 6:30 p.m.  In addition, both witnesses placed Petitioner and his co-defendant in Sissy's light blue car at that time, and Mr. Johnson testified he heard about the shooting 30-45 minutes after Petitioner left his location.

(3)     <em>Discussion</em>

As previously explained, for the sake of this discussion, the Court presumes counsel performed deficiently in not abiding by Petitioner's alleged wish to testify.  The Court concludes, however, based on the record that Petitioner is unable to show prejudice.  The record establishes that it was not reasonably likely that Petitioner's testimony would have made any difference in light of all the other circumstantial evidence of guilt, the lack of factual details provided by his testimony, and the contradictory nature of his testimony.  Although Petitioner's alibi witnesses testified he never left the house in Sissy's blue car with his co-defendant after Mr. Coleman was stabbed, there were other parties whose testimony contradicted his alibi.

Had Petitioner presented the testimony he proffered during his state post-conviction hearing, there is no reasonable probability the outcome of his different would have been different.  First, the state would have been able to impeach him with his prior criminal convictions.  Second, his

34

testimony was contradictory. And third, his testimony confirms the testimony of Ms. Jones and Mr. Johnson's–both of whom were witnesses for the state and testified they saw him when he drove to their location in a light blue car between 6:00 and 6:30 p.m.–and contradicts his alibi witnesses testimony that he never left his house until later in the evening.

Taking into consideration, all the trial evidence plus Petitioner's proposed testimony, there is simply no evidence to undermine the Court's confidence in the jury verdict. The Court is unable to conclude that had counsel permitted Petitioner to testify, there is a reasonable probability the outcome of the trial would have been different. Indeed, based on the record, the Court concludes there is not a reasonable probability the outcome of the trial would have been different had Petitioner testified.

Accordingly, Respondent's motion for summary judgment on Petitioner's claim that trial counsel was ineffective for failing to allow Petitioner to testify will be **GRANTED** and this claim will be **DISMISSED**.

### B. Denial of Due Process

Petitioner contends he was denied due process when the trial court failed to instruct the jury as to all the lesser-included offenses of first-degree murder. Respondent asserts the claim is procedurally defaulted as a result of Petitioner's failure to present this claim to the state appellate courts, on either direct appeal or post-conviction proeedings (Court File No. 9, at 11).

Petitioner raised three issues on his direct appeal [Addendum No. 2, Document 1, at 10]. The following is Petitioner's statement of the issues on direct appeal:

1.    "Whether Those Rights Guaranteed The Appellant By The 5th Amendment To The U.S. Constitution and Article I sec. IX of the Tennessee Constitution were Violated When The Foreman Of The Jury Directed The Jury That Appellant Should Be Convicted Because He Elected Not To Take The Stand."

35

2.    "Whether The State Suppressed Exculpatory Evidence When It Caused Or Permitted The Victim's Jacket To Be Destroyed?"

3.    "Whether Appellant Was Convicted Solely Upon The Non-Corroborated Testimony Of An Accomplice?"

Petitioner presented the following two issues in his state post-conviction brief on appeal:

1.    "The trial court erred in refusing to grant Hyatte a new trial after proof that he was deprived of his constitutional right to testify and that such denial was not harmless error."

2.    "The trial court erred in refusing to grant Hyatte a new trial after proof established that he was denied effective assistance of counsel."

[Addendum No. 4, Document 1, at iii].

Although Hyatte's alleged constitutional violation the trial court failed to instruct on all lesser included offenses of murder was raised at the trial post-conviction level, he failed to appeal the trial court's conclusions that it did instruct the jury on the proper lesser included offenses, and that Petitioner's conviction of the indicted offense rendered any error in the court's instructions as to lesser included offenses harmless beyond a reasonable doubt [Addendum No. 3, Vol. 1, at 96]. Because Petitioner failed to appeal that ruling,  he has committed a procedural default for which no cause and prejudice or miscarriage of justice has been shown.  Accordingly, this claim will be **DISMISSED** as procedurally defaulted.

C.    **Sufficiency of the Evidence**

Petitioner asserts the evidence presented at trial was insufficient to support his murder conviction and sentence.  Specifically, Petitioner contends the record shows he is actually innocent. Petitioner further alleges his conviction is based on the perjured trial testimony of Bobby Combs (Court File Nos. 2 &3).

Respondent contends the claim is procedurally barred because Petitioner never presented this

36

claim to the state appellate courts, on either direct or post-conviction appeal. According to Respondent, Petitioner is now barred by the post-conviction statute of limitations and restrictions on successive state petitions prevent him from presenting such a claim at this time. Tenn.Code Ann. § 40-30-102(a), 102(c), and 117. Because Petitioner has never fairly presented the claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to it, the claim is deemed procedurally barred from federal habeas review (Court File No. 9, at 13).

A review of the issues raised on direct and post-conviction appeal in Section B as discussed earlier, reveals Petitioner did indeed fail to raise any claim premised on insufficiency of the evidence either on direct appeal or post-conviction appeal. "If a prisoner failed to exhaust his or her state court remedies and state law would no longer permit the petitioner to raise the claim when he or she files a petition for habeas relief in federal court, the claim is procedurally defaulted." *Carter v. Mitchell,* 693 F.3d 555, 564 (6th Cir. 2012). Thus, because Petitioner's sufficiency of the evidence claim was never fairly presented to the state courts and a state procedural rule prohibits the state court from considering it, the claim is procedurally barred from federal habeas review.

Although procedural default is excused if a petitioner demonstrates either cause for the default and resulting prejudice, or that failure to consider the claim will result in a fundamental miscarriage of justice, *Franklin v. Bradshaw,* 695 F.3d 439, 449 (6th Cir. 2012), Petitioner failed to address his procedural default in his habeas petition or in his opposition to Respondent's motion for summary judgment (Court File No. 18). Consequently, Petitioner's failure to demonstrate cause and prejudice or a fundamental miscarriage of justice results in the claim being procedurally defaulted. Accordingly, Respondent's motion for summary judgment on the sufficiency of the evidence claim will be **GRANTED**, and this claim will be **DISMISSED**.

## D. Denial of Right to Testify

Next Petitioner complains he was denied his "fundamental right [to] testify [at trial]." (Court File No. 2). Respondent maintains this claim is barred by procedural default because the claim was raised for the first time in his state post-conviction proceedings and the Tennessee Court of Criminal Appeals concluded Petitioner had waived the issue under Tenn.Code Ann. § 40-30-106(g) by failing to present it on direct appeal. *Hyatte,* 2009 WL 55917, at *7.

As noted later in this opinion, the state post-conviction trial court identified this claim as presenting "the question of whether Petitioner was denied his Constitutional right to testify in his own behalf at the trial of this cause, and as an adjunct, whether Petitioner's Counsel was ineffective in not allowing the Petitioner to testify." [Addendum No. 3, Vol. 1, at 96]. The post-conviction trial court addressed this issue finding no error but without specifically making a finding on Petitioner's constitutional right to testify or the two prongs of the *Strickland* test.

On appeal, as discussed in Section V. A. 1. d. later in this opinion, the Tennessee Criminal Court of Appeals concluded the "right to testify" issue was waived pursuant to Tenn. Code Ann. § 40-30-106(g), as a result of Petitioner's failure to present the ground for relief on direct appeal. In addition, the appellate court agreed "with the thorough analysis of the post-conviction court and conclude[d] that any error in this respect was harmless beyond a reasonable doubt." *Hyatte v. State,* 2009 WL 55917, 7-9.

The State court initially concluded, pursuant to Tenn. Code Ann. § 40-30-106(g),[11] this issue

---

[11] Generally, Tenn. Code Ann. § 40-30-106(g) provides that a ground for relief is waived if a petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented. The two exceptions to this rule are not applicable to Petitioner's case, and he does not present an argument to the contrary.

was waived because Petitioner failed to raise it on direct appeal. *Hyatte,* 2009 WL 55917 at *7.

The Sixth Circuit recognizes the Tennessee waiver statute, Tenn. Code, Ann. § 40-30-106(g) as an independent and adequate state rule that is regularly enforced. *Cone v. Bell,* 243 F.3d 961, 969 (6th Cir. 2001), *overruled on other grounds by Bell v. Cone*, 535 U.S. 685 (2002). Because the state court explicitly invoked a state procedural bar as a separate basis for its decision, this federal court is required to honor it. *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("Moreover, a state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Coe v. Bell,* 161 F.3d 320, 330 (6th Cir. 1998) (The state appellate court's finding that a claim was waived and thus barred because it was not previously raised and alternatively it had no merit did not require the Sixth Circuit "to disregard the state court's finding of procedural bar"). Therefore, because the state court decision rested on a state procedural bar, its alternate consideration of the merits of the claim does not waive the procedural bar.

To excuse his procedural default, Petitioner must demonstrate cause for his noncompliance and actual prejudice resulting from the alleged constitutional violation, or a miscarriage of justice. *Franklin v. Bradshaw,* 695 F.3d at 449. Here, Petitioner makes no argument that his procedural default should be excused under either the cause and prejudice standard or miscarriage of judgment standard.

Moreover, assuming for the sake of discussion that this claim is properly before the Court, Petitioner must demonstrate the state court decision is contrary to or an unreasonable application of federal law. The Supreme Court has explained that "[a] state court decision will certainly be

contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases[,] . . .[or] if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent" *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Neither the Court's research nor Petitioner's pleadings demonstrate the state court decision was contrary to Supreme Court precedent.

To demonstrate the state court unreasonably applied federal law, Petitioner must demonstrate the state court decision identified the correct governing legal rule from Supreme Court precedent but unreasonably applied it to the facts of Petitioner's case or that the state court unreasonably extended a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refused to extend that principle to a new context where it should apply. *Id.* at 407-08. Petitioner has failed to make such a showing.

Aside from the fact this claim is defaulted, the Court concludes the state court's alternate resolution of this claim, finding if there was error it was harmless, was not unreasonable or contrary to federal law. The Supreme Court has instructed that habeas relief is appropriate only if the state court applied harmless-error review in an objectively unreasonable manner. *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003). In addition, the Supreme Court has explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree" on the correctness of the state court's decision." *Harrington v. Richter,* 131 S.Ct. 770, 784 (2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)). As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner *must show* that the state

40

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 131 S.Ct. At 786-87 (emphasis added).

Although the Court is mindful that during deliberations, a juror indicated it was his opinion Petitioner would have testified if he was in fact innocent, the Court is unable to conclude the state court applied harmless-error review in an objectively unreasonable manner based on the entire state trial and post-conviction record, including Petitioner's criminal record and the content of the proffer of testimony made by him during his state post-conviction proceedings. Consequently, Petitioner has not met his burden of proving the Tennessee Criminal Court of Appeals rendered a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.

Accordingly, Respondent will be **GRANTED** summary judgment on Petitioner's claim that he was denied his right to testify, and this claim will be **DISMISSED** as procedurally barred, and in the alternative as lacking any merit.

### E.   Prosecutorial Misconduct

Petitioner's next claim is one of alleged prosecutorial misconduct. Specifically, Petitioner complains that the prosecutor's comments were misleading and prejudicial, thus resulting in a violation of his due process rights. Although difficult to decipher, and Petitioner does not identify the comments he is challenging, it appears Petitioner is complaining the prosecutor commented on his failure to testify. As noted in Section B,earlier*,* Petitioner did not raise this claim on direct appeal or post-conviction appeal. Accordingly, absent a showing of cause and prejudice or a miscarriage of justice, Respondent will be **GRANTED** summary judgment on this claim, and Petitioner's prosecutorial misconduct claim will be **DISMISSED** as procedurally barred.

41

**F.** **Allegation Accomplice Testimony Was Not Corroborated and Insufficient Accomplice Jury Instruction**

Petitioner seemingly challenges the trial court's accomplice testimony jury instruction and alleges his accomplice's testimony was not corroborated. The Court will address the claims individually.

### 1. *Accomplice Jury Instruction*

Petitioner contends the trial court erred when giving the accomplice instructions because they "were not only inconsistent but without providing an incorrect [sic] statement of Tennessee Law." (Court File No. 3). Petitioner's claim the state trial court erred by failing to provide a correct statement of Tennessee law is not cognizable for federal habeas corpus review because a claim upon which habeas relief can be granted, must be a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Unless the alleged error has also deprived Petitioner of a federal constitutional right, a mere state-law error cannot form the basis for habeas relief. 28 U.S.C. § 2254(a). Liberally construing this claim as stating a constitutional violation, it is procedurally defaulted, as Petitioner failed to present this claim to the state appellate court on direct appeal or post-conviction appeal. *See* Section B *supra.*

A review of the trial court's jury instruction on accomplice testimony reveals the Court charged the jury that they were required to find Garmany's testimony was sufficiently corroborated before convicting Petitioner. There was no error in the court's instruction. Moreover, a habeas challenge to a jury instruction requires more than showing the instruction was erroneous; it requires a showing that the instruction "so infected the entire trial that the resulting conviction violated due process. *Cupp v. Naughten,* 414 U.S. 141, 147 (1973). This, Petitioner has not done.

Accordingly, Respondent will be **GRANTED** summary judgment on the jury instruction

42

claim and Petitioner's claim that the trial court provided an inadequate accomplice jury instruction will be **DISMISSED** as procedurally defaulted, and alternatively as meritless**.**

2. _Corroboration of Accomplice Testimony_

Petitioner maintains his conviction is based on uncorroborated accomplice testimony. On direct appeal, the Tennessee Court of Criminal Appeals rejected Petitioner's argument that the State witness Greg Garmany was an accomplice, thus necessitating corroboration under Tennessee law. The appellate court made an alternative finding, that even if Garmany was an accomplice, there was sufficient corroborating evidence to support Petitioners conviction. As previously noted, "[a] violation of state law is not cognizable in federal habeas corpus unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution." _Cristini v. McKee_, 526 F.3d 888, 897 (6th Cir. 2008). The appellate court addressed the claim as a matter of state law:

> In Tennessee a defendant cannot be convicted solely on uncorroborated accomplice testimony. _Sherrill v. State_, 321 S.W.2d 811,814 (Tenn.1959); _State v. Gaylor_, 862 S.W.2d 546, 552 (Tenn.Cr.App.1992). An accomplice is "a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime." _Clapp v. State_, 30 S.W.2d 214, 216 (Tenn.1895); _State v. Lawson_, 794 S.W.2d 363, 369 (Tenn.Cr.App.1990). Accomplice testimony will be considered corroborated if "there is some other evidence fairly tending to connect the defendant with the commission of the crime." _Marshall v. State_, 497 S.W.2d 761, 765-66 (Tenn.Cr.App.1973); _see Clapp_, 30 S.W.2d at 216. This other evidence "must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference ... that the defendant is implicated in [the commission of a crime].... This corroborative evidence may be ... entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction...." _Hawkins v. State_, 469 S.W.2d 515 (Tenn.Cr.App.1971) quoted in _Gaylor_, 862 S.W.2d at 552. Whether an accomplice's testimony has been sufficiently corroborated is a question for the jury. _Gaylor_, 862 S.W.2d at 552.
>
> In this case, Greg Garmany was the State's only witness regarding what happened after he and the Appellant left Taylor Hills. The Appellant argues that Greg Garmany was an accomplice to the Appellant and that his testimony implicating the Appellant

43

as the killer was not corroborated. We disagree. Assuming arguendo that Greg Garmany was an accomplice to the Appellant, we find that there was sufficient corroborating evidence to support the Appellant's conviction.

Immediately after the Appellant and Garmany heard about the stabbing, they got Bobby Combs to show them where Johnny Dillard ran into the woods. The Appellant and Garmany then went up to the woods to look for Dillard. Before coming back into the projects, Bobby Combs overheard either the Appellant or Garmany state "let me get this gun out of my pocket and put it in safety." Moreover, before the Appellant and Garmany left Taylor Hills they encountered Ms. Jones and asked her whether she had seen a white man running through the area. They then encountered Mr. Johnson and the Appellant asked him whether he had seen a white man, and told him that this white man had stabbed his friend and that he would take care of the situation. Finally, there was also testimony at trial from Billy Coleman, who asked the Appellant approximately three months after the stabbing if he knew who had killed Johnny Dillard. The Appellant apparently responded to the inquiry by stating: "Never underestimate the power of friends."

Moreover, the trial judge properly instructed the jury on the law pertaining to accomplice testimony and the jury found that either Greg Garmany was not an accomplice and his testimony did not need corroboration or that Greg Garmany was an accomplice and that his testimony was sufficiently corroborated. We do not find any reversible error.

*State v. Hyatte,* 1997 WL 53454, at *5-6.

Initially, the Court observes that Garmany was indicted as a co-defendant in this murder case and the state trial court specifically instructed the jury that "[i]n this case, the Court charges you that the witness, Gregory Scott Garmony, was an accomplice in this alleged crime, and before the defendant can be convicted, you must find this accomplice's testimony has been sufficiently corroborated." [Addendum No. 1, Vol. 6, at 489].

Nevertheless, as the state appellate court concluded, there is sufficient evidence other than the accomplice testimony tending to connect Petitioner with the offense committed. When the Court considers the state court's conclusion against the backdrop of the details of the testimony presented at trial, which is  discussed in detail above in connection with Petitioner's alibi claim, it is clear

44

Garmany's testimony was corroborated by several of the state's witnesses, specifically Ms. Jones' and Mr. Johnson's testimony that placed Petitioner in a light blue vehicle near the vicinity of the murder soon before it occurred.

Finally, the state court's resolution of this issue was not contrary to, or an unreasonable application of federal precedent. Indeed, the Sixth Circuit has instructed that it is "well-established Sixth Circuit precedent that uncorroborated testimony of an accomplice may support a conviction under federal law." *United States v. Echols,* 84 Fed.Appx. 544, 549 (6th Cir. 2003) (citations and internal punctuation omitted); *see also United States v. Turpin,* 317 Fed.Appx. 514, 517 (6th Cir. 2009) (noting the uncorroborated testimony of an accomplice may support a conviction under federal law). In addition, the Supreme Court has explained "in federal practice there is no rule preventing conviction on uncorroborated testimony of accomplices, as there are in many jurisdictions, and the most comfort a defendant can expect is that the court can be induced to follow the better practice and

caution the jury against too much reliance upon the testimony of accomplices." *Krulewitch v. United States,* 336 U.S. 440, 454 (1949) (citation and internal punctuation omitted).

Accordingly, because Petitioner has not demonstrated the state appellate court's determination of the facts was unreasonable or the state court decision was contrary to, or an unreasonable application of Supreme Court precedent, Respondent will be **GRANTED** summary judgment, and Petitioner's claim that his accomplice's testimony was not corroborated will be **DISMISSED.**

## V.   CONCLUSION

Respondent's motion to dismiss and for summary judgment (Court File No. 9) will be

**GRANTED** as to all claims. Petitioner is not entitled to an evidentiary hearing, and his § 2254

petition will be **DISMISSED** (Court File No. 2).

A judgment will enter.

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**